**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-3357-WJM

D'ANNA L. HOUSEMAN,

      Plaintiff,

v.

CAROLYN W. COLVIN, acting Commissioner of Social Security

      Defendant.

---

**ORDER REVERSING ADMINISTRATIVE LAW JUDGE'S DECISION
AND REMANDING FOR AN IMMEDIATE AWARD OF BENEFITS**

---

      This matter is before the Court on review of the Commissioner of Social

Security's ("Defendant") decision to deny Plaintiff D'Anna Houseman's ("Plaintiff")

application for disability insurance benefits.  Plaintiff filed an Opening Brief (ECF No.

13), Defendant filed a Response (ECF No. 14), and Plaintiff filed a Reply (ECF No. 15).

After reviewing the briefs and administrative record filed with the Court, Defendant's

decision to deny Plaintiff's application disability insurance benefits is reversed and this

matter is remanded for an immediate award of benefits.

## I.  BACKGROUND

      Plaintiff was born on October 25, 1967.  (Record ("R.") (ECF No. 9) at 1128.)

Plaintiff's medical records indicate she has been diagnosed with fibromyalgia,

migraines, degenerative joint disease, carpal tunnel syndrome, chiari malformation, and

lichen planus.  (*Id*. at 22-23; 1156.)  Plaintiff alleges a disability onset date of October

30, 2006.  (*Id*. at 870.)  Plaintiff has past relevant work as a food service manager and a

receptionist.  (*Id*. at 875.)

Plaintiff initially filed an application for benefits in August 2009 (*id*. at 216), which was denied on July 27, 2011 by Administrative Law Judge Kathryn Burgchardt ("the ALJ").  (*Id*. at 28.)  The Social Security Appeals Council declined to review the ALJ's July 2011 decision.  (*Id*. at 1.)  On September 13, 2012, Plaintiff appealed the ALJ's decision to this Court.  (*Id*. at 867.)  The Court vacated and remanded the ALJ's decision for multiple reasons, including the lack of substantial evidence supporting the ALJ's residual functional capacity ("RFC") finding.  *Houseman v. Colvin*, 2013 WL 4657646, at *1 (D. Colo. Aug. 30, 2013).

In July 2013, prior to the issuance of the Court's remand order, Plaintiff filed a second application for benefits.  (R. at 1128-29.)  The ALJ consolidated these two cases, and, on May 20, 2014, the ALJ again found that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id*. at 876.)  The Appeals Council denied Plaintiff's request for review of the May 20, 2014 decision.  (*Id*. at 847-48.)

In her May 20, 2014 decision, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, from the date of her application for benefits through the date of the decision.  (*Id*. at 876.)  The ALJ made the following findings of fact and conclusions of law in accordance with the Commissioner's five-step sequential evaluation process.[1]  At step one, the ALJ found that Plaintiff had not

---

[1]   The five-step process requires the ALJ consider whether a claimant: (1) engaged in substantial gainful activity during the alleged period of disability; (2) had a severe impairment; (3) had a condition which met or equaled the severity of a listed impairment; (4) could return to her past relevant work; and, if not, (5) could perform other work in the national economy.  *See* 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988.)  The claimant has the burden of proof through steps one to four; the Social Security

engaged in any substantial gainful activity since her alleged onset date of October 30, 2006.  (*Id*. at 870.)  At step two, the ALJ held that Plaintiff had the following severe impairments: fibromyalgia; migraines; degenerative joint disease of the bilateral knees, status-post knee replacements; carpal tunnel syndrome, post release; lichen planus; and obesity.  (*Id*.)  In addition to Plaintiff's severe impairments, the ALJ found that Plaintiff had the following non-severe impairments: anemia, vitamin D deficiency, a chiari malformation, hemangioma, nausea status post gastric bypass surgery, and hypertension.[2]  (*Id*.)  At step three, the ALJ held that Plaintiff's impairments do not meet or equal the severity of the established listing of impairments under the governing regulations.  (*Id*.)  The ALJ then analyzed Plaintiff's RFC, concluding that Plaintiff has the RFC to:

> lift and carry 10 pounds frequently and 20 pounds occasionally; stand or walk a total of four to six hours, and sit a total of six hours, in an eight-hour workday, but she may use a cane to ambulate and she requires a sit/stand option while remaining at the workstation (meaning she can sit/stand at will while performing [t]he assigned duties); perform pushing and pulling motions with her upper extremities within the aforementioned weight restrictions, but she should avoid pushing and pulling bilaterally with the lower extremities; and occasionally climb stairs and ramps, stoop, crouch, kneel and crawl, but she cannot climb ladders, ropes or scaffolds.  The claimant should avoid unprotected heights, moving machinery, and extreme heat

---

Administration has the burden of proof at step five.  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[2]  Defendant states that a "Chiari malformation" is "a condition in which brain tissue extends into the spinal canal," "lichen planus is an inflammatory condition that can form lacy white patches, sometimes with painful sores," and a "hemangioma is a birthmark that most commonly appears as a rubbery, bright red nodule of extra blood vessels in the skin."  (ECF No. 14 at 2, 11.)

and cold.  The claimant should have reasonable access to a
bathroom (meaning the claimant must not be in a position in
which she is unable to leave the line and must be able to get
someone to cover her duties for a moment while she uses
the restroom).  The claimant can speak on the job, but she
should not perform work that requires constant talking to the
general public or co-workers.

(*Id*. at 871.)  The ALJ then ruled at step four that Plaintiff was unable to perform any

past relevant work.  (*Id*. at 875.)  However, considering the RFC assessment described

above, along with Plaintiff's age, education, and work experience, at step five the ALJ

determined that there are jobs that exist in significant numbers in the national economy

that Plaintiff can perform.  (*Id*.)  Those jobs include companion, cashier, and assembler.

(*Id*. at 876.)

On December 11, 2014, Plaintiff initiated this action challenging the ALJ's May

20, 2014 denial of benefits, which is now before the Court.  (ECF No. 1.)

## II.  LEGAL STANDARD

The Court reviews the Commissioner's decision to determine whether substantial

evidence in the record as a whole supports the factual findings and whether the correct

legal standards were applied.  *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Id*.  "It requires more than a scintilla, but less than a

preponderance."  *Lax*, 489 F.3d at 1084.  Evidence is not substantial if it is

overwhelmed by other evidence in the record.  *Grogan v. Barnhart*, 399 F.3d 1257,

1261-62 (10th Cir. 2005).  In reviewing the Commissioner's decision, the Court may

neither reweigh the evidence nor substitute its judgment for that of the agency.  *Salazar*

4

*v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006). "On the other hand, if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

## III.  ANALYSIS

Plaintiff challenges the ALJ's decision in several respects, arguing that: (1) the ALJ failed at step two to consider all medically-documented impairments and the combined effect of those impairments, which had an adverse impact on the ALJ's analysis at subsequent steps of the evaluation; (2) at step three, the ALJ failed to properly evaluate whether Plaintiff's impairments met or medically equaled the severity of the listing of impairments; (3) the ALJ's finding that Plaintiff had the RFC for a range of light work is not supported by substantial evidence; and (4) the ALJ's step five determination is not supported by substantial evidence. (ECF No. 13.) Each of these assignments of error relates, in some way, to the ALJ's treatment of Plaintiff's lichen planus condition. The Court finds that the ALJ did not properly analyze or discuss this condition along with Plaintiff's other impairments, which mandates reversal.

## A.    Lichen Planus

The Court's August 30, 2013 Order that reversed the ALJ's July 27, 2011 decision and remanded the matter for further proceedings was based almost entirely on the ALJ's analysis of Plaintiff's lichen planus condition. *Houseman*, 2013 WL 4657646, at *4. In her July 2011 decision, the ALJ found Plaintiff's lichen planus was not a severe condition:

> Claimant has also been treated for some gynecological
> conditions which were non-severe, namely lichen planus

5

and irregular uterine bleeding.  She has been treated for
lichen planus and abnormal uterine bleeding by physicians
at the University of Colorado Hospital.  Claimant apparently
was diagnosed with lichen planus nearly two decades ago.
After the diagnosis, claimant went on to work on a full-time
basis and raise a family.  Her treatment for these conditions
have included dilation and curettage (D&C) procedures and
use of topical ointments and oral medications.  She reported
in August of 2010 that her medications were very helpful and
prevented flares.  Therefore, while medically determinable,
these conditions did not impose more than minimal
limitations in the ability to do basic work activities and were
consequently non-severe.

(R. at 23 (citations omitted).)  The Court disagreed, and found that the ALJ's conclusion

was "overwhelmed by evidence of treating physicians who proffer evidence to the

contrary."  *Houseman*, 2013 WL 4657646, at *4.  The Court also specifically rejected

Defendant's contention that because Plaintiff had endured lichen planus for two

decades, this justified the ALJ's finding that the condition was not severe.  *Id*. at n.6.  To

the contrary, the Court noted that Plaintiff's condition was "worsening" as recently as

February 2011.  *Id*.  The Court further stated that "[a]ny notion that Plaintiff did not show

that she was limited by lichen planus is absurd."  *Id*. at n.7.  The Court directed the ALJ

to review all the medical reports in greater detail on remand, and noted that "the ALJ

well may need to obtain further medical evidence on Plaintiff's condition so that the

record can be properly developed before a final ALJ decision is made."  *Id*. at n.5.

In her May 20, 2014 decision following the Court's remand Order, the ALJ found

that Plaintiff's lichen planus was a severe condition.  (R. at 870.)  However, the ALJ did

not find that the lichen planus met or equaled the severity of any established listing of

impairments.  (*Id*. at 871.)  The ALJ went on to reach a conclusion in the RFC portion of

the analysis similar to that in her July 2011 decision:

> The claimant has also been treated for lichen planus and irregular uterine bleeding.  She has been treated by physicians at the University of Colorado Hospital.  The claimant apparently was diagnosed with lichen planus nearly two decades ago.  After the diagnosis, the claimant went on to work on a full-time basis and raise a family.  Treatment for these conditions have included dilated and curettage (D&C) procedures and use of topical ointments and oral medications.  The claimant reported in August of 2010 that her medications were very helpful and prevented flares.  The Claimant has experienced periods of flares; however, the evidence does not reflect that the claimant has been referred to a specialty clinic.  Further it is not clear that the claimant has been consistent in complying with prescribed treatment, given her conflicting reports; in June 2012, for example, the claimant initially reported using Clobetasol cream a few times per month, but after examination reported that she is using it daily for years.  The evidence does not establish the extreme limitations alleged by the claimant.  To accommodate the claimant's symptoms, however, the undersigned limits the claimant to work involving a sit/stand option, reasonable access to a bathroom and no constant talking to the general public or co-workers.

(*Id*. at 874 (citations omitted).)

Plaintiff objects to the ALJ's characterization of her lichen planus.  Plaintiff argues that she has not merely experienced "periods of flares"; rather, her lichen planus exhibits a chronic and unremitting condition.  (ECF No. 13 at 34.)  The Court agrees that the ALJ improperly diminished the severity of Plaintiff's lichen planus.

The ALJ's decision puts a good deal of stock in a single report from Sylvia Brice, M.D. dated August 11, 2010.  (R. at 693.)  In her August 11, 2010 notes, Dr. Brice states that she placed Plaintiff on Griseofulvin medication on March 31, 2010.  (*Id*.)  Dr. Brice reports that Plaintiff "feels that Griseofulvin is very helpful, and is controlling her lesions well.  If she misses a dose, she notices she gets flares."  (*Id*.)

Dr. Brice's report does not at all reflect the subsequent increasing severity of

Plaintiff's condition, and the pain it entails, as documented by the medical records that

follow this visit:

- On December 22, 2010, Plaintiff was examined by Patrick
  Galaska, PA-C of Dermatology Clinic, P.C. who noted under
  "Chronic skin conditions," "lichen planus orally, vaginally very
  painful . . . vaginal pain & erosion." (*Id*. at 785.)

- On December 28, 2010, Plaintiff saw Svetlana Tsirkin, M.D.
  of Peak Vista Community Health Centers for a pelvic exam.
  (*Id*. at 832.) Dr. Tsirkin's notes state: "unable to perform pap
  or pelvic exam. . . . Pt. to have pelvic exam under
  anaesthesia." (*Id*.) She also noted that Plaintiff's condition
  was "worsening," with "complaints of constant burning." (*Id*.
  at 832-33)

- On February 17, 2011, Plaintiff again saw Dr. Tsirkin, who
  noted: "Unable to do pap smear in the office. . . . Extremely
  scarred perineum, friable vaginal tissue. . . . Tissue was
  noted to be extremely friable. There was bleeding just from
  touching [it] . . . ." (*Id*. at 806-07.)

- On March 8, 2011, Plaintiff saw Dallas Thompson, D.O. of
  Peak Vista Community Health Centers who noted "vaginal
  burning . . . Burning with urination: chronic, Vaginal dryness,
  Vaginal itching . . . Erosive lichen planus." (*Id*. at 821-23.)

- On September 19, 2011, Plaintiff saw Dr. Thompson a
  second time for dilation and curettage and a pap smear that
  were performed under anaesthesia. (*Id*. at 1208.) Dr.
  Thompson described the procedure as follows: "The introitus
  was scarred down to a very small size, impeding speculum
  insertion. There appeared to be vaginal involvement with
  . . . very fragile vaginal mucosa that bled just with touching it
  with a laparotomy sponge. . . . There were two lesions that
  were excised on the patient's left side and right side." (*Id*. at
  1209.)

- On February 8, 2012, Dr. Thompson performed a
  hysteroscopy and an edomentrial ablation on Plaintiff,
  noting: "Vaginal mucosa was torn during the insertion of the
  speculum due to the fragile nature of the skin and scarring

from lichens sclerosis.  Her introitus has been scarred, smaller than normal unfortunately.  My recommendation is if she has had three negative pap smears that she does not need to undergo any further pap smears for the remainder of her life as she will be unable to tolerate in office pap smear and will require anaesthesia each time. . . .  Weighted speculum . . . tore the vaginal mucosa on both the right and left side due to the small introitus caused by scarring from her lichen sclerosis."  (*Id*. at 1204-05.)

•   On June 27, 2012, Plaintiff was examined by Amy Clauss, M.D. of Peak Vista Community Health Centers for complaints of "abnormal bleeding."  (*Id*. at 1456.)  Dr. Clauss stated in her notes: "Location/source of the bleeding is vaginal.  The patient describes it as clotting.  Frequency: irregular.  The problem is worse.  Denies aggravating factors.  Denies relieving factors. . . .  several white plaques around posterior fourchette and athropic surrounding tissue which is very painful to touch."  (*Id*. at 1456-58.)

•   On October 8, 2012, Plaintiff saw Dr. Tsirkin for a "vulvar evaluation."  (*Id*. at 1473.)  However, "[e]xamination of the vagina revealed unable to evaluate due to pain."  (*Id*. at 1475.)

•   On October 10, 2012, Plaintiff returned to Dr. Thompson for complaints due to her "lichen sclerosis."  (*Id*. at 1476.)  In her notes, Dr. Thompson stated: "The symptoms are reported as being incapacitating.  The symptoms occur constantly.  The location is vulva.  Aggravating factors include nothing.  Relieving factors include nothing. [Plaintiff] states the symptoms are uncontrolled. . . .  It is very painful." (*Id*. at 1476-78.)  Under "Assessment/Plan," Dr. Thompson continued: "Lichen scleros[i]s . . . of the vulva.  Severe in nature.  I do not think that surgery is a good option.  She will have poor wound healing and increased chance of post-operative complications, infections, etc."  (*Id*. at 1478.)

•   On January 10, 2013, Plaintiff saw Michael Turner, M.D. of Colorado Springs Dermatology Clinic, P.C., who wrote: "Pt dx . . . lichen planus . . . blisters . . . + itch vaginal area . . . needs surgeries [for] vaginal stenosis . . . very painful."  (*Id*. at 1545.)

- On April 15, 2013, Plaintiff saw Heidi Hudson, PAC of Peak Vista Community Health Centers due to "burning on urination." (*Id*. at 1492.) Ms. Hudson wrote: "The severity of the problem is moderate. Pain scale: 6/10. The problem has worsened. The symptoms are constant. Presenting/initial symptoms include burning, dysuria and nausea. . . . She suffers from lichen planus and states 'right now my vagina is not open because of it.'" (*Id*.)

- On April 22, 2013, Plaintiff returned to Peak Vista Community Health Center to see Dr. Thompson, who wrote: "The [lichen planus] symptoms are reported as being severe. The symptoms occur daily. The location is vulva. Aggravating factors include urination. Relieving factors include nothing. She states the symptoms are uncontrolled. Pt having burning and itching when urinating for about 6w." (*Id*. at 1494.) Dr. Thompson further observed: "Vaginal introitus almost completely fused. I could not get my pinky finger in without causing pain. . . . She is getting worse. She is failing TID Temovate. She has not improved with dermatology referral." (*Id*. at 1496.)

- On July 15, 2013, Plaintiff presented to Sonya Erickson, M.D. and Julie Lemoine, M.D. of University of Colorado Hospital; Dr. Lemoine wrote: "Lichen planus: worsening symptoms on current regimen. This regimen was given by Dr. Gibbs and dermatology in 2011, but she is no longer responding. . . . She complains of painful urination (burning in [th]e vagina), vaginal itching and laceration in the vagina when she has flares. She never has complete relief from symptoms. Her symptoms are getting worse . . . . No longer using dilators, was too painful. Her vagina is completely closed." (*Id*. at 1447-48.) Dr. Erickson further wrote: "Her primary goal at this time is to manage her vulvar pain. Her vaginal opening is severely constricted . . . . Her ongoing lichen planus disease is quite advanced and exceeds my level of expertise." (*Id*. at 1449.)

- On October 4, 2013, Plaintiff was examined by Roland S. Gibbs, M.D. of University of Colorado Hospital. (*Id*. at 1449-50.) Dr. Gibbs wrote: "[Plaintiff] is having symptoms of difficulty urinating . . . . Is also having constant itching, burning, and cracking." (*Id*. at 1450.)

- On November 11, 2013, Plaintiff was examined by L. Chesney Thompson, M.D. of the University of Colorado Hospital, who wrote: "Over the last mos to year she has worsening irritation, swelling and soreness around vagina and urethral meatus with difficulty voiding and diminished/weak urinary stream." (*Id*. at 1452.)

This treatment history is uncontradicted and the record contains no substantive evidence, apart from Dr. Brice's single August 11, 2010 report, that Plaintiff's symptoms were ever truly under control.  Consequently, the Court finds that Plaintiff's treatment history in no way exhibits "periods of flares."  (*Id*. at 874.)  While gaps in Plaintiff's treatment may exist, the medical history above summarizes three years of near-constant pain, multiple medical procedures, and treatment—without any apparent improvement whatsoever.  Indeed, as the Court stated in its August 30, 2013 Order, Plaintiff's condition appears to be *worsening*.  Plaintiff's description of her experience living with this condition is heart-rending:

> Q.  Now the one thing we haven't talked too much about is the bleeding and you referenced earlier you have lots of vaginal bleeding?
>
> A.  Yes.
>
> Q.  Back in October, '06, is that from the lichens planus?
>
> A.  That's the lichen planus bulbosa.
>
> . . .
>
> Q.  And is that where it affects you the most?
>
> A.  Yes, in the—last year they actually had to do surgery to open up the vagina area . . . because of the scar tissue and just wiping when I go pee will rip me open and I'll start bleeding.
>
> Q.  So does that require a lot of excessive bathroom use?

11

A.      Yes, or I have to lay down.  And it burns—when I pee,
        it burns.  And it causes . . . [b]leeding, yes, like huge
        blood clots . . . that come out.  I've had it so that my
        chair at work . . . I have to go to the bathroom and
        clean up or change clothes and I've had it—they just
        sent me home the last time in '06, because it was
        filling—the chair was ruined.

(*Id*. at 57-58.)  On June 1, 2011, the ALJ conducted a second hearing  at which Plaintiff

further testified:

Q.      Since the last hearing have you had any break outs
        relating to your lichen planus?

A.      Yes, I've had to actually have—I can't even have a
        pap smear without being put in the hospital and put
        under and they have to—they did removal of scar
        tissue because every so often the scar tissue get[s]
        so bad that it actually closes my vagina up so they
        have to remove the scar tissue and the break outs get
        so bad that I am—I can't sit down.  I have to be in bed
        . . . .  I'm on like several different steroids to control it
        and when they stop working we have to switch the
        steroids to control the outbreaks . . . .

Q.      Why do the steroids stop working?

A.      My body gets immune to them.  There is no cure for
        lichen planus so they just have to try to keep it under
        control with steroids. . . .  [T]he lichen planus . . . the
        problems are just increasing.

(*Id*. at 77-78.)  Plaintiff testified a third time on March 4, 2014 following the Court's

remand Order.  (*Id*. at 946.)  Plaintiff testified that her lichen planus "closes the urethra

shut" and has "to sit on the toilet sometimes 15 minutes just to empty" her bladder.  (*Id*.

at 947.)  Plaintiff also testified that the "heavy bleeding" started in 2006 (the year of her

disability onset) that began affecting her ability to work.  (*Id*. at 955.)  The Court finds

Plaintiff's lichen planus treatment history, and her testimony regarding its impact on her

12

personal life, to be nothing short of shocking.  The Court also finds that Plaintiff's testimony is entirely consistent with her medical records.

The ALJ's contention that it "is not clear" that Plaintiff has been consistent with her prescribed course of treatment is likewise contradicted by the great weight of the evidence in the record.  (*Id*. at 874.)  The ALJ notes that in June 2012, Plaintiff reported to Dr. Clauss that she had been using Clobetasol cream "a few times a month," but when questioned further, Plaintiff stated she had been using it daily to no avail.  (*Id*. at 1458-59.)  What the ALJ omits, however, is that Plaintiff also stated that she "couldn't use it very often because it hurts so bad."  (*Id*. at 1459.)  This statement is supported by the numerous medical reports stating the skin in Plaintiff's genital area was extremely fragile, and would often crack or bleed on contact.  Other record evidence suggests that Plaintiff's various treatment regimens, including Clobetasol, did little to alleviate her condition.  Dr. Chesney reported in November 2013 that Plaintiff had been prescribed Clobetasol, "but soon found this irritating and ineffective."  (*Id*. at 1452.)  Plaintiff's medical records also support her testimony that certain medications are rendered ineffective over time.  Dr. Thompson reported in October 2012, "Pt not improving on daily Temovate cream," and Dr. Leomine wrote in July 2013 that Plaintiff exhibited "worsening symptoms on current regimen" prescribed in 2011 to which she was "no longer responding."  (*Id*. at 1447, 1476.)  The Court thus finds that the one treatment note cited by the ALJ does not supply substantial evidence of Plaintiff's noncompliance with any prescribed course of treatment.

**B.      The Disability Listings and the Substantial Evidence Standard**

Given the ALJ's failure to properly address the severity of Plaintiff's impairments, the Court must determine whether this matter should be remanded for further findings, or reversed for an immediate award of benefits.  "Outright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose."  *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989).  To make this finding, the Court must be satisfied that Plaintiff is disabled as a matter of law and is entitled to the benefits for which she applied.  *Id*.  As described below, two independent bases exist for an award of benefits:  Plaintiff's condition meets or medically equals one of the established listings of impairments, and the ALJ's decision was not based on substantial evidence.

With regard to the listing of impairments, the analysis of a claim at step three of the evaluation process requires consideration of whether a claimant has an impairment that meets or equals any listing found at 20 C.F.R., Pt. 404, Subpt. P, App'x 1.  If a claimant has such an impairment, she is deemed disabled and no further analysis is required.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); (d).  A claimant's impairment "meets" a listing if such impairment matches all of the specified criteria in one of the listings.  *Id*. § 404.1525(c)(3).  However, under step three, a finding of disability is also required if a claimant's impairment, or combination of impairments, "equals" a Listing.  *Id*. § 404.1526(a).  An impairment "equals" a Listing where it is "at least equal in severity and duration to the criteria of any listed impairment."  *Id*.  Plaintiff "has the burden at step three of demonstrating, through medical evidence, that his impairments meet *all* of

the specified medical criteria contained in a particular listing." *Riddle v. Halter*, 10 F. App'x 665, 667 (10th Cir. 2001) (emphasis in original).

Plaintiff argues that her lichen planus falls under Social Security listing 8.00 (Skin Disorders), specifically listing 8.05.  (ECF No. 13 at 14.)  Listing 8.05 covers: "Dermatitis (for example, psoriasis, dyshidrosis, atopic dermatitis, exfoliative dermatitis, allergic contact dermatitis), with extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed."  20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 8.05.

The preamble to listing 8.00 explains how dermatitis and "chronic infections of the skin or mucous membranes" are evaluated.  *Id*. § 8.00(A).  For example, "extensive skin lesions," as referenced in listing 8.05, are those that involve "critical body areas, and result in a very serious limitation," including "[s]kin lesions on . . . the perineum, or both inguinal areas that very seriously limit your ability to ambulate."[3]  *Id*. § 8.00(C)(1)(c).  "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  *Id*. § 1.00(B)(2)(b)(1)-(2).  Examples of ineffective ambulation include the inability to: walk a block at a reasonable pace on rough or uneven surfaces, climb a few steps with the use of a hand rail, or use standard public transportation.  *Id*.  The claimant's ability to walk independently in his or her home without the use of an assistive device does not, standing alone, constitute effective ambulation.  *Id*.

---

[3]  "[T]he Commissioner recognizes that Plaintiff's lichen planus was a chronic condition that caused scarring on her perineum . . . ."  (ECF No. 14 at 14.)

The ALJ found that, "As to listing 8.05, the evidence does not show that the claimant's lichens planus results in a very serious limitation as defined in 8.00C.  The undersigned gives little weight to the questionnaires filled out by Dallas Thompson, D.O., Sylvia Brice, M.D., and Tyler Muffly, M.D."  (R. at 871.)  In the questionnaires, Drs. Thompson, Brice, and Muffly each opined that Plaintiff's condition met or equaled listing 8.05.  (*Id*. at 1541, 1686, 1691).  Each physician reached this conclusion based on his or her physical examination of Plaintiff and accompanying medical records.  (*Id*.)  The ALJ nonetheless found these opinions were conclusory and unsupported by treatment notes, and were thus entitled to "little weight."  (*Id*. at 871.)

The ALJ further discounted the opinion of Plaintiff's treating physician, Mark Warwick, M.D.  Dr. Warwick opined that Plaintiff could not walk a full block "without rest or severe pain," could sit for only fifteen minutes, and could stand for zero minutes "before needing to sit down, walk around, etc."  (*Id*. at 548.)  The ALJ found this opinion to be inconsistent with the records of Theodore Stringer, M.D. who on November 3, 2009, following Plaintiff's right knee replacement, stated Plaintiff had "full extension, good alignment and stability," and did "very favorably without ambulatory assist and with minimal right sided antalgia."  (*Id*. at 457.)  Likewise, the ALJ stated Plaintiff's left knee replacement was "uneventful."  (*Id*. at 873.)  The ALJ found this evidence reason to assign Dr. Warwick's opinion "little weight," particularly since he had discontinued his treatment of Plaintiff in 2010.  (*Id*. at 874.)

Finally, the ALJ found that Plaintiff's fibromyalgia and musculoskeletal impairments did not seriously impact her physical condition including her ability to walk.

(*Id*. at 872-73.)  The ALJ acknowledged that fibromyalgia "cannot be established through diagnostic testing," but discounted Plaintiff's fibromyalgia because the American College of Rheumatology guidelines specify that the pain must be widespread in all four quadrants of the body and "at least 11 of 18 specified tender points on the body."  (*Id*. at 872.)  Because Plaintiff had five trigger points during a consultative examination in 2010 with Timothy R. Hudson, M.D., the ALJ imposed only "environmental and other restrictions" to compensate for the limited impact of Plaintiff's fibromyalgia.  (*Id*.)

 The Court concludes that the ALJ's findings are overwhelmed by the remaining record evidence, and that the ALJ failed to comply with the Court's remand Order.  The ALJ's decision was thus not based on substantial evidence given her erroneous treatment of Plaintiff's lichen planus and musculoskeletal impairments.

The ALJ chose to give little weight to Dr. Warwick's opinion, claiming in part that Dr. Warwick had a "sporadic treatment relationship with" Plaintiff.  This statement defies credulity, given the fact that Dr. Warwick treated Plaintiff close to *fifty times* between July 2007 and November 2010.  (*Id*. at 510-25, 560, 689-91, 797-98.)  Moreover, Dr. Warwick continued to treat Plaintiff for nearly a year after Dr. Stringer last examined her.  (*Id*. at 602.)  Treatment notes from Peak Vista Community Health Centers after this time further support Plaintiff's claims of constant pain throughout her body, specifically associated with movement including walking.   For example, on April 20, 2011, Plaintiff was examined by Brenda Walker-Conner, M.D. for back pain: "Onset: 1 week ago.  Severity level is 9. . . .  The problem is worsening.  It occurs persistently.

17

Location of pain was the middle back.  Pain has radiated to the back. . .  piercing, sharp and stabbing.  Context: walking."  (*Id*. at 815.)

This condition only appears to have worsened based on follow-up treatment notes.  Plaintiff was examined by Jennifer Pharris, D.O. on July 19, 2012 for "Chronic Pain . . . concern for fibromyalgia."  (*Id*. at 1464.)  Dr. Pharris wrote: "Onset: 1 year ago.  Severity level is 6.  The problem is fluctuating.  It occurs persistently.  Location of pain was lower back.  Pain has radiated to the back, left arm, right arm and both legs. . . .  Symptoms are aggravated by ascending stairs, bending, changing positions, daily activities, descending stairs, standing and walking."  (*Id*. at 1465.)  Dr. Pharris made the same findings on July 29, 2013: "[B]ack pain . . . severity level is 10.  The problem is worsening.  It occurs persistently. . . .  Symptoms are aggravated by ascending stairs, bending, changing positions, coughing, daily activities . . . sitting, sneezing, standing, twisting and walking."  (*Id*. at 1504.)

In its prior Order, the Court expressed its concern that the ALJ had engaged in the "picking and choosing" of evidence and that, at least with regard to Plaintiff's lichen planus condition, there was an abundance of evidence in the record from treating physicians that the ALJ chose to ignore without any apparent principled reason.  *Houseman*, 2013 WL 4657646, at *1-4.  To the dismay of this Court, a similar pattern of "picking and choosing" among the evidence in the record was engaged in by the ALJ on remand, especially with regard to Plaintiff's lichens planus condition, as well as her musculoskeletal impairments.

By way of just brief example, just as Plaintiff's August 2010 statement to Dr. Brice that her medications were "very helpful and prevented flares" in no way

18

represents the true severity of her lichen planus documented over the following years, the ALJ's citation to the one-time consultative examination by Dr. Hudson, and the handful of reports from Dr. Stringer, simply does not accurately portray Plaintiff's musculoskeletal pain.  Given Dr. Warwick's opinion and the treatment records from Peak Vista cited above, the Court finds that the ALJ's findings with respect to multiple of Plaintiff's major impairments are, once again, heavily overwhelmed by the record evidence to the contrary.  The Court further finds that, based on the evidence above, Plaintiff is disabled, and should be awarded benefits due to the lack of substantial evidence to support the ALJ's decision.

Alternatively, Plaintiff's lichen planus, combined with her serious musculoskeletal pain, suffices to meet or equal listing 8.05.  Plaintiff's condition exhibits an extremely severe case of dermatitis with "extensive skin lesions," as defined in the relevant regulations, that has persisted for years, despite continued treatment.  *See* 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 8.05.  The Court further finds that Dr. Warwick's opinion, considered with Plaintiff's remaining medical records, indicates that Plaintiff's combined musculoskeletal impairments "very seriously limit [her] ability to ambulate." *Id*. § 1.00(B)(2)(b)(1)-(2).  Three other treating physicians also specifically opined that Plaintiff's impairments met or medically equaled listing 8.05.  (R. at 1541, 1686, 1691). Plaintiff is accordingly disabled within the meaning of the Social Security Act.

The Court has reached this conclusion after considering the record as a whole, the ALJ's decision, and the history of this case.  It is abundantly clear to the Court that any additional fact finding would not serve a useful purpose here.  *Sorenson*, 888 F.2d at 713.  "The decision to direct an award of benefits should be made only when the

administrative record has been fully developed and when substantial and uncontradicted evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Moore v. Astrue*, 2009 WL 215356, at *4 (D. Kan. Jan. 28, 2009). Such is the case here. The medical record in this case is voluminous and charts numerous years of Plaintiff's treatment history. These records, in the Court's view, clearly establish that Plaintiff is entitled to the benefits she seeks.

But the Court must also consider more practical concerns. One factor deemed relevant by the Tenth Circuit is the length of time the matter has been pending. *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006). Plaintiff alleges a disability onset date of October 2006, and she filed her application for disability benefits in August 2009. (R. at 20.) This matter has therefore been pending, either before the ALJ or in this Court, for *over six years*. The Court also already remanded this case once, in August 2013, for further consideration of the exact same condition on which the Court now bases its disability determination. *Houseman*, 2013 WL 4657646, at *1. "The Secretary is not entitled to adjudicate a case *ad infinitum* until it correctly applies the proper legal standard and gathers evidence to support its conclusion." *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 746 (10th Cir. 1993); *see also Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993) ("In light of the Secretary's patent failure to satisfy the burden of proof at step five, and the long delay that has already occurred as a result of the Secretary's erroneous disposition of the proceedings, we exercise our discretionary authority to remand for an immediate award of benefits.").

Enough is enough.  The Court refuses to force Plaintiff to proceed with her case any further; she will not be required to endure yet another round of evidence gathering and another hearing on yet a further remand.  There comes a time when the law, the facts, and indeed the interests of justice clearly point to but one conclusion: Ms. Houseman has met her burden under the Act, and the Social Security Administration has not.

## IV.  CONCLUSION

Based on the foregoing, the Court ORDERS that Defendant's determination that Plaintiff is not disabled is REVERSED.  The Court hereby further ORDERS that this matter be REMANDED to the Commissioner for an immediate award of benefits as of October 30, 2006, Plaintiff's disability onset date.

Dated this 2nd day of November, 2015.

BY THE COURT

_____
William J. Martínez
United States District Judge